UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY WHITE,

        *Plaintiff*,

v.

        CASE NO. 17-cv-12344
        DISTRICT JUDGE TERRENCE G. BERG
        MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 16, 17)**

**I.    RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 16), be **DENIED**, that the Commissioner's Motion, (Doc. 17), be **GRANTED**, and that this case be **AFFIRMED**.

**II.    REPORT**

    **A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Timothy White's claim for Disability Insurance Benefits ("DIB") and

1

Supplemental Security Income benefits ("SSI"). (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 16, 17).

On August 15, 2014, Plaintiff filed the instant applications for SSI and DIB, alleging a disability onset date of June 1, 2012. (Tr. 169-81).[1] The Commissioner denied his claims. (Tr. 53-76). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on March 16, 2016 before ALJ John Dodson. (Tr. 31-52). The ALJ issued a decision on April 25, 2016, finding Plaintiff not disabled. (Tr. 11-28). On July 17, 2017, the Appeals Council denied review, (Tr. 1-6), and Plaintiff filed for judicial review of that final decision on July 19, 2017. (Doc. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

---

[1] The record contains a prior application for DIB as well, dated July 22, 2014. (Tr. 163-67). It appears, however, that Plaintiff intended to begin the process anew with his dual applications a month later.

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically

> determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual

4

functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.     ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff not disabled under the Act. (Tr. 11-28). At Step One, the ALJ found that Plaintiff would meet the insured status requirements of the Act through September 30, 2018, and had not engaged in substantial gainful activity since June 1, 2012, his alleged onset date. (Tr. 16). At Step Two, the ALJ concluded that the following impairments qualified as severe: joint dysfunction of the knees and ankles, hypertension, chronic heart failure, and obesity. (Tr. 16-17). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 17-18). Thereafter, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except

> he is limited to: never climbing ladders, ropes, or scaffolds, and performing all other postural activities on an occasional basis; avoiding moderate exposure to pulmonary irritants, hazards, humidity, or extreme temperatures;

> and needing a sit-stand option that would allow a change between sitting and standing up to three times an hour.

(Tr. 18). At Step Four, the ALJ found Plaintiff incapable of performing his past relevant work. (Tr. 22). But proceeding to Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 23-24).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Plaintiff's medical records. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Administrative Hearing

##### i. Function Report

Plaintiff's Function Report, dated August 27, 2014, appears in the administrative record. (Tr. 241-48) In it, he described his conditions as "swelling of feet and ankle" due to arthritis. (Tr. 241). Each day he would shower, "sit around the house" and "talk to my mom until 5:30 p.m. then I go to work for 4 hours then go home and watch t.v. until I fall asleep." (Tr. 242). His pain caused him to toss and turn in the night. (*Id.*). He did not struggle with personal-care activities. (*Id.*). He baked chicken salads daily, which took an "hour or two." (Tr. 243). However, if his feet or knees swelled he could not "get up" and therefore could not bake. (*Id.*). He continued to wash dishes and launder his clothes when needed. (*Id.*). He also helped his mother with yard work. (Tr. 244).

6

He walked outside and drove "often." (*Id.*). He also shopped for "cheap shoes and clothes" at retail stores on occasion. (*Id.*). He remained able to handle his finances. (*Id.*). His hobbies included watching television and playing video games, which he did regularly. (Tr. 245). Every other day his best friend would come over to play video games with him. (*Id.*). He also frequently went to church and his part-time job. (*Id.*). Prompted to indicate what abilities he struggled with, Plaintiff marked bending, standing, walking, and stair climbing. (Tr. 246). In "[l]ess than 20 min[utes]" of "standing on my feet and walking up stairs," Plaintiff's knees would begin to hurt. (*Id.*). He used crutches "when swelling [o]ccurs." (Tr. 247).

ii.  **Plaintiff's Testimony at the Administrative Hearings**

Opening his testimony, Plaintiff noted he had "congestive heart failure, and my heart is only pumping 25 percent, and it, like, it races, you know, real hard. I have to stop, then sit down to get a rest to get myself back together." (Tr. 34). A sleeping study revealed sleep apnea. (Tr. 40). He also struggled with arthritis in his left knee and gout. (Tr. 34). At the time of the hearing, Plaintiff was working for Aramark on a part-time basis as a cleaner in a dental office; he worked four hours, five days a week. (Tr. 35). However, his condition had recently caused some absenteeism: "Because of my condition, you know, I missed a lot of days, and they constantly write me up because of my condition." (*Id.*). On average, he missed "more than one or two days a month." (Tr. 36). He had completed the twelfth grade and attained his GED, but he never went to college. (*Id.*). He could only walk to "the elevator and back, and then I'll sit down for a couple seconds" to sooth the pain. (Tr. 37). He needed the rest because his heart would

7

race and "I breathe harder." (*Id.*). He could only stand for about five minutes before needing to sit. (*Id.*). He lived in the basement of his mother's house, and could generally handle the six-step decline to his room. (Tr. 38). He was capable of lifting "big bags" of molding clay and tossing them into the dumpster. (Tr. 39).

At his part-time job, he spent about "20 percent" of his time sitting down and off-task. (Tr. 42). When gout caused his ankles and knees to swell, he had to "go to my doctor, and they'll . . . give me steroids." (*Id.*). But this had not been a problem in the time leading up to the hearing because "they have me taking Allopurinol, 100 milligrams. . . . so everything been doing" okay. (Tr. 43).

Plaintiff previously worked as a driver, and he "used to drive to Cleveland" on a regular basis. (Tr. 44). This job ceased eventually because "[t]hey had stopped the run to Cleveland." (Tr. 45). He also used to work "at a supermarket" as "a bagger," but this was more than fifteen years prior to the hearing and the ALJ indicated there was no occasion to consider it. (*Id.*).

### ii. The VE's Testimony at the Administrative Hearings

The VE began by classifying Plaintiff's prior work: "He worked as a housekeeper, or janitor, SVP of two, which is unskilled, physical demand being light per *DOT* and light as he performs it, and he worked as a truck driver, SVP of four, which is semi-skilled. Physical demand per *DOT* medium; however, light as he has performed it." (Tr. 47). He also classified Plaintiff's prior job at Value World from 1997 to 2009 as "a material handler, stock person, SVP of two, which is unskilled. Physical demand per *DOT* medium, and medium as he performed it per the record that I reviewed." (*Id.*).

The ALJ then posed the first hypothetical, asking the VE to imagine a person "capable of light work. There could be no ropes, ladders, or scaffolds. Only occasional remaining postural. There could be no concentrated exposure to—not even moderate exposure to pulmonary irritants, hazards, humidity, or extreme temperatures. Would such a person be able to perform any of Mr. White's prior relevant work?" (Tr. 48). The VE said that such an individual could not perform Plaintiff's prior work, but other jobs would exist, including: "garment sorter position" (with 3,100 regional jobs and 200,000 national jobs); "nut and bolt assembler position" (with 2,200 regional jobs and 400,000 national jobs); and "inspector/packer position" (with 2,500 regional jobs and 800,000 national jobs). (Tr. 48-49).

On top of these limitations, the ALJ added another: "What if you added to that a sit/stand option up to three times per hour?" (*Id.*). The VE said "[t]hose jobs would remain; however, I would reduce the national, and [regional], numbers in half based upon that sit/stand." (*Id.*). The ALJ pressed further: "And what if you took that same hypothetical but reduced the exertional limitation to sedentary?" (*Id.*). The VE described some additional applicable job availabilities: "surveillance monitor position" (with 1,000 regional jobs and 80,000 national jobs); "final assembler position" (with 2,400 regional jobs and 200,000 national jobs); and "nut sorter position" (with 3,800 regional jobs and 450,000 national jobs). (Tr. 50). Plaintiff's counsel then asked whether these numbers would change if the individual were to miss "more than two work days a month," and the VE said such a limitation would preclude all work. (*Id.*). The VE clarified as well than an

9

individual who would be off task twenty-five percent of the workday could not find competitive employment. (Tr. 51).

**F.  Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at

whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §

11

404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the

alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

   (i)     [D]aily activities;
   (ii)    The location, duration, frequency, and intensity of . . . pain;
   (iii)   Precipitating and aggravating factors;
   (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
   (v)     Treatment, other than medication, . . . received for relief of . . . pain;
   (vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective

statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

Plaintiff raises only one argument in the instant Motion: the ALJ discounted the opinion of his treating physician, Dr. Weathersby, based solely on its prediction that Plaintiff "would likely be absent 3-4 days of work a month," which the ALJ felt "had no basis" despite its consistency with Plaintiff's actual work record. (Doc. 16 at ID 698). As such, Plaintiff argues that "the ALJ's RFC is incomplete as stated" and remand is required. (*Id.*).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the

14

source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating* source's opinion." *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

Contrary to Plaintiff's averments, the ALJ engaged in a thorough, evenhanded discussion regarding Dr. Weathersby's assessments before according them only partial weight. After summarizing the medical evidence of record and Dr. Weathersby's findings, the ALJ aptly noted—with plentiful accompanying citations—that "the record does not support [Dr. Weatherby's] limitations on the claimant's ability to sit, stand, and walk, or her indication that the claimant would miss up to four days a month due to his impairments." (Tr. 22) (citing (Tr. 281-83, 296, 305-06, 326-27, 339-40, 345-47, 381-82, 459, 466, 534-35, 552-53, 560, 632-34, 640-41, 648-49)). The citations point directly to evidence showing normal physical exams, a lack of tenderness, mild objective evidence,

15

and a number of other areas of inconsistency between Dr. Weathersby's opinions and the record evidence. The remainder of the ALJ's opinion also addressed these records, noting the multitude of merely mild objective evidence therein, the absence of evidence showing impaired motor function or otherwise abnormal physical symptoms, and the wide variety of daily activities Plaintiff could perform. *See* (Tr. 19-21). The record corroborates his conclusions. *E.g.*, (Tr. 59, 68-69, 341, 358, 365, 441-43, 545-47, 560, 593, 602) (mild objective evidence); (Tr. 340-346, 359, 377, 385, 396, 404, 417, 421, 425, 452, 633, 643) (unimpaired motor function); (Tr. 279, 345, 406) (success with medication); (Tr. 295, 304, 312, 319, 334, 339, 345, 351, 377, 381, 396, 400, 404, 451, 458, 474, 552, 585, 633, 636, 640, 643, 649) (normal muscle strength); (Tr. 313, 320, 334, 340, 346, 352, 356, 382, 389, 401, 404, 408, 422, 459, 475, 553, 586, 633-34, 644, 647, 649) (normal range of motion); (Tr. 304, 313, 320, 334, 340, 346, 352, 356, 373, 376, 381, 387, 392, 395-96, 400, 406, 409, 420, 451, 459, 475, 534-35, 541, 553, 586, 632-33, 636-37, 640, 646-47) (normal cardiovascular findings); (Tr. 296, 326) (lack of tenderness).

To the extent Plaintiff supposes his absenteeism ought to independently factor into his RFC, he is mistaken. "Absenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded." *Griffin v. Comm'r of Soc. Sec.*, No. 2:15-CV-13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017); *see also Hartman v. Clovin*, F. Supp. 2d 618, 645 (W.D. Ky. 2013) ("Nowhere in the hearing decision does ALJ Jacobs directly speak to the question of *medically necessary*, but otherwise excessive, absenteeism and its impact on Hartman's ability to perform substantial gainful activity.").

16

Even assuming Plaintiff could prove that his actual absenteeism at his prior job aligned with Dr. Weathersby's assessment—which the Commissioner disputes, (Doc. 17 at ID 719-20)—he simply cannot show that it was medically necessary. In point of fact, the record contains myriad instances suggesting just the opposite. *See, e.g.*, (Tr. 383, 402) (Dr. Weathersby: "Pt. was informed that he needs to return to work, and I will not give a note excusing the days he missed, because he didn't call, nor seek medical attention, and it seems to me that he can go work his 4 hours and go home and elevate the joint.").

Accordingly, there exists no doubt as to why the ALJ felt Dr. Weathersby's opinion was unsubstantiated. The reasons he supplied were indeed good, the thus his decision to discount Dr. Weathersby's absenteeism-related prediction is supported by substantial evidence.

Plaintiff's Response to the Commissioner's Motion, (Doc. 18), adds another layer to the original argument I address above. In it, he argues that the state agency examiner did not have the records most pertinent to Plaintiff's cardiac issues when he made his determination, which showed Plaintiff's "'thrombos [sic] heart' and chronic heart failure," causing "a major change in the RFC for Plaintiff." (Doc. 18 at ID 725). In his view, "the Commissioner misses that during" the period postdating the state agency examination, "Plaintiff had significant cardiac issues, including a [sic] ejection fraction of less than 20%." (*Id.*). "Further, [Dr. Weathersby's] assessment of the number of days off work is consistent with Plaintiff's medical conditions that were diagnosed after he had been observed by the state agency. To rely so heavily on the state agency report when it

did not have all of the current medical conditions is against the rules and regulations." (*Id.*). This argument remains underdeveloped and lacks merit.

At the outset, I must note that Plaintiff overstates the ALJ's endorsement of the state agency medical opinion over Dr. Weathersby's opinion: the ALJ credited Dr. Weathersby's opinion weight to the extent it showed "the claimant is limited to light exertional work," just as he credited the state agency examiner weight for consistency with evidence limiting Plaintiff to work at "the light exertional level with additional limitations." (Tr. 21-22). The difference in the weight he accorded evidently rests on the supportability and consistency of the opinion given the evidence before each respective examiner. Indeed, the ALJ found "slightly more restrictive limitations based on the combined effects of all impairments," implicitly acknowledging that the examiner missed later significant evidence at issue; by contrast, the ALJ discounted portions of Dr. Weathersby's opinion because her conclusions *did not follow* from the evidence in her own (among other) treatment records. Perhaps more importantly, however, Plaintiff admits that no error exists in such a situation so long as the ALJ gives "'some indication'" he considered significant facts postdating a state agency examination. (Doc. 18 at ID 726) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)). Yet Plaintiff either ignores or forgets the portion of the ALJ's analysis explicitly addressing the allegedly unaccounted-for evidence:

> In October 2014, the claimant had normal range of motion with no tenderness in his extremities, normal cardiovascular findings, and no motor sensory deficits. Later that month, the claimant was admitted to the emergency room with edema in his lower extremities and shortness of breath. *An echocardiogram and heart catheterization found the claimant*

18

> *had an ejection fraction of less than 20 percent.* After receiving treatment for three days including diuretics, the claimant's edema was almost gone, his shortness of breath was resolved, his labs were within normal limits, and his vital signs were stable. . . . At a follow-up examination at the end of October, the claimant indicated he needed a note to return to work, denied any cardiovascular issues, denied any lower extremity swelling, and had normal cardiovascular findings.

(Tr. 20). If this were not enough, the ALJ discusses numerous additional records postdating the state agency examiner's opinion which showed normal cardiovascular findings. *See generally* (Tr. 20-22).

For these reasons, substantial evidence also bolsters the ALJ's findings as to the state agency examiner's opinion, and the Court should disregard Plaintiff's arguments to the contrary.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 16), be **DENIED**, that the Commissioner's Motion, (Doc. 17), be **GRANTED**, and that this case be **AFFIRMED**.

### III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991);

19

*United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: April 10, 2018                    S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge

### CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 10, 2018                    By s/Kristen Castaneda
                                        Case Manager

20